**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **JOSHUA LUKE and THE READMISSION PREVENTION GROUP, INC.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CHARLES BONGIOVANNI and NATIONAL POST-ACUTE CARE CONTINUUM,**<br><br>**Defendants.** | **Case No.: SACV 16-00499-CJC(KESx)**<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiffs Joshua Luke and The Readmission Prevention Group, Inc. bring this action against Defendants Charles Bongiovanni and National Post-Acute Care Continuum for assorted tort and contract claims related to a consulting agreement.

Before the Court are two motions: Defendants' motion to dismiss for lack of personal jurisdiction, (Dkt. 12), and Defendants' converted motion for summary judgment, (Dkt. 21). For the following reasons, Defendants' motions are both DENIED.[1]

## II. BACKGROUND

Plaintiff Joshua Luke is a health care executive and the founder of Plaintiff The Readmission Prevention Group, Inc. ("TRPG"). (Dkt. 22-1 ["Luke MSJ Decl."] ¶¶ 4–5.) TRPG is in the business of hosting "healthcare events" and working with hospitals to "develop new revenue streams generated from developing population management models to replace diminishing inpatient revenue." (*Id.* ¶ 5.) TRPG's events include health care conferences designed to facilitate introductions between "leaders in health care," "sales people" from health care companies, and the health care companies themselves. (*Id.* ¶ 7.) TRPG sponsored 18 such conferences during 2014 and 2015. (*Id.*) TRPG also has local chapters in various markets around the country. (*Id.*)

Two of the attendees at TRPG's conferences were Defendant Charles Bongiovanni and his company, Care Patrol Franchise Systems, LLC ("Care Patrol"). (Luke MSJ Decl. ¶ 8.) In 2015, TRPG entered an agreement with Care Patrol whereunder TRPG provided certain services to Care Patrol in exchange for monthly compensation. (*Id.*) Pursuant to that agreement, Bongiovanni was a featured speaker at 16 TRPG events, including seven in California. (*Id.* ¶ 7.)

During the summer of 2015, Bongiovanni asked Luke how many conferences he was planning to have TRPG hold in 2016. (Luke MSJ Decl. ¶ 11.) Luke told

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for August 1, 2016 at 1:30 p.m. is hereby vacated and off calendar.

Bongiovanni that he was only planning to do 12, and Bongiovanni expressed a desire to participate in more. (*Id.*) The two began to discuss Bongiovanni potentially acquiring TRPG and running the conferences himself. (*Id.*; *see also* Dkt. 21-1 ["Bongiovanni MSJ Decl."] ¶ 18.) The initial purchase price discussed by the parties was $360,000. (Luke MSJ Decl. ¶ 12; Bongiovanni MSJ Decl. ¶ 20.) At some point Bongiovanni proposed to pay $240,000 for TRPG and produced a draft agreement. (Luke MSJ Decl. ¶ 12; *id.* Ex. 2; Ex. 3.)

The parties exchanged drafts of an agreement that would govern the sale of TRPG from Luke to Bongiovanni. In November 2015, however, Bongiovanni proposed that rather than acquiring TRPG, his company, Defendant National Post-Acute Care Commission ("NPACC") could manage the conferences by way of a collaborative agreement between NPACC and TRPG. (Luke MSJ Decl. ¶ 16.) Luke would essentially serve as a consultant and earn a consulting fee. On December 7, 2015, Bongiovanni produced another draft agreement (the "Consulting Agreement") and sent it to Luke. (Luke MSJ Decl. ¶ 18.) Luke made interlineations to the Consulting Agreement, signed it, and sent a copy back to Bongiovanni, asking him to sign and return it. (*Id.* ¶ 19.) Bongiovanni replied, "Let's chat tomorrow afternoon" and then failed to provide Luke with a countersigned Consulting Agreement, despite a number of requests from Luke. (*Id.* ¶¶ 19–20.)

The Consulting Agreement provides that NPACC was contracting with Luke for the provision of certain services over the course of one year. (Bongiovanni MSJ Decl. Ex. C ["Consulting Agreement"].) In exchange for an $8,000 monthly fee, Luke would, among other things, provide NPACC with TRPG's advertising, marketing, and promotional materials, provide contact information for attendees of TRPG's conferences, video record a presentation that NPACC could play at its conferences, and introduce NPACC to potential vendors. (*Id.* at 7–8.)

Notwithstanding some confusion concerning the Consulting Agreement and whether an executed agreement existed, the parties pressed ahead as if they had a deal. Consistent with the Consulting Agreement's terms, on January 4, 2016, Luke traveled to Phoenix, Arizona to record the video presentation that Bongiovanni planned to show at the conferences. (Luke MSJ Decl. ¶ 25.) Luke also says that he provided Bongiovanni with materials specified in the Consulting Agreement, including "vendor lists," "attendee lists," "tool kits," vendor strategies," and "business strategies" of TRPG. (*Id.* ¶ 26.) Bongiovanni was wholly unsatisfied with Luke's offerings and came to believe that Luke did not actually have the materials mentioned in the Consulting Agreement.

Luke's first $8,000 payment under the Consulting Agreement was due January 1. (Consulting Agreement at 1.) NPACC did not send a check, and Bongiovanni told Luke that he would be paid while he was in Arizona recording the video. (Luke MSJ Decl. ¶ 27.) Luke sent an invoice but was not paid in Arizona. On January 17, Luke sent Bongiovanni an email about the invoice, and Bongiovanni said he would "see if we can mail it off today or wire it tomorrow." (*Id.* ¶ 27; *id.* Ex. 13.) Luke never received any money, and he says that Bongiovanni never had any intention of paying him. (*Id.* ¶ 27.)

Based on Bongiovanni and NPACC's failure to pay him under the Consulting Agreement, the FAC asserts six causes of action, for (1) breach of implied-in-fact contract, (2) appropriation of likeness, (3) conversion, (4) promissory fraud, (5) quantum meruit, and (6) unfair competition. (*See generally* FAC.) The thrust of the FAC is that Bongiovanni entered into the Consulting Agreement with Luke in an attempt to get Luke to give up his TRPG-related intellectual property and record the video. Bongiovanni and NPACC never intended to pay Luke, he says. Instead, the scheme was to steal Luke's information and push him and TRPG out of the market. To this end, Luke says that Bongiovanni and NPACC have already begun converting TRPG chapters to NPACC chapters, which Bongiovanni operates. (*Id.* ¶ 24.)

On April 15, 2016, Defendants moved to dismiss, arguing both that this Court lacks personal jurisdiction over them and that Plaintiffs had failed to state a claim. (*See* Dkt. 12.) On May 10, 2016, noting that there were important disputes over whether the Consulting Agreement constitutes a valid contract, as well as over whether Plaintiffs manufactured favorable jurisdictional evidence, the Court converted Defendants' motion to dismiss to a motion for summary judgment and ordered additional briefing. (Dkt. 19.) Two issues are currently before the Court: whether it should dismiss the case for lack of personal jurisdiction, and whether Defendants are entitled to summary judgment on any of Plaintiffs' claims.

## III. DISCUSSION

### A. Personal Jurisdiction

#### 1. Legal Standard

A party may move to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Federal courts may only decide cases over which they have both statutory and constitutional jurisdiction. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the court sits. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006). Because California's long-arm statute, California Civil Procedure Code section 410.10, extends jurisdiction to the limit of federal due process, the Court need only analyze the constitutional question. *See id.*; *Glencore*, 284 F.3d at 1123.

Constitutional due process concerns are satisfied when a nonresident defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Under the minimum contacts analysis, jurisdiction may be general or specific. *Id.* It is the plaintiff's burden to establish the court's personal jurisdiction over a defendant. *Id.* at 922. When a district court acts on a defendant's motion to dismiss without an evidentiary hearing, the plaintiff need only demonstrate facts that, if true, would support jurisdiction over the defendant. *Id.* Thus, the court may consider evidence presented in affidavits to assist it in its determination, but any factual disputes are resolved in plaintiff's favor. *Id.* When the plaintiff's version of the facts is not directly controverted, it is taken as true for the purposes of a Rule 12(b)(2) motion. *Id.* However, the district court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

Plaintiffs, who bear the burden of establishing personal jurisdiction, do not allege that either Defendant is subject to general jurisdiction in California. Accordingly, only specific jurisdiction is at issue. In the Ninth Circuit, courts "employ a three-part test to assess whether a defendant has sufficient contacts with the forum state to be subject to specific personal jurisdiction." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). The parts are:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id.* The plaintiff has the burden of proving the first two prongs. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011). If a plaintiff is able to successfully do so, "the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Picot*, 780 F.3d at 1212.

The exact form of the personal jurisdiction inquiry depends on the nature of the claims at issue. For claims sounding in contract, courts "generally apply a 'purposeful availment' analysis and ask whether a defendant has 'purposefully avail[ed] [himself] of the privilege of conducting activities within a forum State, thus invoking the benefits and protections of its laws." *Picot*, 780 F.3d at 1212 (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). For claims sounding in tort, by contrast, courts apply a "purposeful direction" test and examine whether the defendant "has directed his actions at the forum state, even if those actions took place elsewhere." *Id.* at 1212.

**2. Tort Claims**

**i. Purposeful Direction**

To establish that Defendants purposefully directed their activities at California, Plaintiffs must demonstrate that Defendants "(1) committed an intentional act,

(2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Picot*, 780 F.3d at 1214. The first two requirements are easily met here. Defendants undertook a number of intentional acts aimed at California, including:

- Negotiating the Consulting Agreement with Luke while he was a California resident and directing emails and telephone calls to him while he was in California. (Dkt. 15-1 ["Luke Decl."] ¶ 17.)
- Soliciting individuals to sign up as NPACC members and permitting those individuals to select one of two California "chapters"—"CA – Greater Los Angeles" or "CA – Northern California"—as their "Chapter Affiliation." (Dkt. 15-2 at 5.)
- Accepting fees from Californians who signed up to be NPACC members or ordered materials, including a book by Luke, from NPACC. (Dkt. 15-4 (cataloguing five such receipts).)
- Advertising two conferences to be held in California. (Dkt. 15-5 at 3 (identifying an October 25, 2016 summit planned for Sacramento, CA and a November 2 summit planned for Burbank, CA.).)
- Maintaining webpages for the California summits which identified speakers, an agenda, and pricing details, and implored prospective attendees to "reserve your spot" because "early bird registration begins soon!" (Dkt. 15-7 at 1–5 (Sacramento); Dkt. 15-9 at 1–5 (Burbank); Dkt. 15-10 at 1–5 (Burbank).)

Defendants also knew that insofar as their actions caused harm, that harm would be suffered in California. They were perfectly aware that Luke is a California resident, and Defendants had even visited Luke on two occasions in California to negotiate business deals. (Luke Decl. ¶ 17.) The torts alleged in the FAC, including conversion, fraud, and appropriation of likeness, were plainly committed against a California resident while he

was in California, by tortfeasors who knew they were directing their actions at California. The purposeful direction requirement is therefore met.[2]

### ii. Relatedness

The next requirement is that the claims at issue "arise[] out of or relate[] to the defendant's forum-related activities." *Picot*, 780 F.3d at 1212. This requirement, too, is met here. Plaintiffs' tort claims, especially the ones for fraud and conversion, arise from California-related activities, especially the negotiation of the Consulting Agreement with Luke, a California resident, and the planning of the California conferences, in which—the FAC alleges—NPACC will use the video of Luke without his permission and without compensating him.

### iii. Reasonableness

As Plaintiffs have established the first two elements, the burden now shifts to Defendants to "set forth a compelling case that the exercise of jurisdiction would not be reasonable." *CollegeSource, Inc.*, 653 F.3d at 1076. Courts in the Ninth Circuit evaluate seven factors in making that determination: "(1) the extent of defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002). Having considered these factors, the Court

---

[2] The parties dispute whether one piece of jurisdictional evidence—a declaration from one Wendy Cohn, submitted by Plaintiffs—is genuine. The Court has reviewed Ms. Cohn's supplemental declaration, (Dkt. 25-1), and elects to disregard both of her declarations for the purposes of determining jurisdiction.

concludes that the exercise of jurisdiction in reasonable here. Defendants have purposefully and meaningfully injected themselves into California by negotiating with Luke, planning and advertising California conferences, and accepting orders for merchandise and chapter membership from Californians. Additionally, given Bongiovanni's history of travel to California to meet with Luke and negotiate business opportunities, it seems quite unlikely that litigation here will burden Defendants in a real way. There is no conflict of sovereignty with Arizona, Defendants' preferred forum, and given the Court's familiarity with the issues here, litigation here will lend itself to an efficient resolution of this dispute. Finally, California has a clear interest in protecting its residents from tortious harm. An exercise of jurisdiction over Defendants with respect to their tort claims is therefore reasonable.

**2. Contract Claims**

Plaintiffs' remaining claims derive from contract law. In the Ninth Circuit, although "a contract alone does not automatically establish minimum contacts in the plaintiff's home forum," *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008), jurisdiction over contract claims is appropriate "where a defendant deliberately has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). Were the Court to rigorously apply this test to this case, it would easily conclude that jurisdiction exists over Plaintiffs' contract claims, as (1) Defendants have purposefully availed themselves of the benefits of California by undertaking continuing contractual obligations to Luke, a California resident, (2) Plaintiffs' contract claims relate to Defendants' purposeful availment, and (3) the exercise of jurisdiction is reasonable. Nevertheless, significant analysis on this point is unnecessary, since the Ninth Circuit has adopted the doctrine of "pendent personal jurisdiction," which holds that "a court may assert pendent personal jurisdiction over a defendant with respect to a

claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). Here, *all* of Plaintiffs' claims arise from a single common nucleus of operative fact. Pendent personal jurisdiction over the contract claims is therefore appropriate.

**B. Summary Judgment**

Defendants initially moved to dismiss each of Plaintiffs' causes of action for failure to state a claim. The Court converted that motion to a motion for summary judgment, noting that the parties were essentially talking past each other. Defendants asserted that a contract existed between NPACC and Luke, and that that contract barred many of Luke's tort claims. Luke insisted that the contract was not valid and that he was entitled to assert tort claims rather than a typical breach of contract claim. Defendants attached the executed contract, but although that document was described in the FAC, the Court's power to take judicial notice of it was unclear. Accordingly, the Court ordered a round of summary judgment briefing to determine whether the parties have a valid contract.

Defendants are not entitled to summary judgment on Plaintiffs' claims. Defendants insist that Plaintiffs' tort and implied-in-fact contract claims fail because of the presence of a valid contract. But Plaintiffs have sufficiently pleaded—and mustered adequate evidence in favor of—their claim for promissory fraud, or "promise made without the intention to perform." *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) ("Promissory fraud is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be

actionable fraud.”). As promissory fraud “vitiates [an] entire agreement and destroys that consent which is essential to the existence of a valid contract,” *Simmons v. Ratterree Lane Co.*, 217 Cal. 201, 204 (1932), the fact that Plaintiffs’ promissory fraud claim survives summary judgment means that their non-contract claims are not necessarily foreclosed. *See Lazar*, 12 Cal. 4th at 631 (where a plaintiff pleads promissory fraud, he may have “a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract”).

Defendants hasten to note the California Supreme Court’s holding that in promissory fraud cases, “something more than nonperformance is required to prove the defendant’s intent not to perform his promise,” and that a plaintiff who can provide nothing more than assertions of intent not to perform may “never reach a jury.” *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985). But here Plaintiffs have produced such evidence. The record demonstrates that Bongiovanni initially proposed purchasing TRPG for $360,000, then $240,000, (Luke Decl. ¶ 12; Bongiovanni MSJ Decl. ¶ 20; Luke Decl. Ex. 2), and then ultimately proposed only the consulting structure the parties ultimately agreed to. After Bongiovanni and Luke exchanged copies of the contract, they finally agreed to terms, and Luke sent a signed copy to Bongiovanni with an email that said, “Sign and return and we are good.” (Luke Decl. Ex. 5.) But rather than signing the contract, Bongiovanni replied, “Let’s chat tomorrow afternoon.” (*Id.*) It did not come to light until later that Bongiovanni *had* apparently signed the contract Luke sent him the next day. And even then, Luke had to badger Bongiovanni to get him to produce *any* copy of the contract that contained all parties’ signatures. An exasperated February 2016 email from Luke to Bongiovanni indicates that Luke had asked for a copy of an executed contract four times, to no avail. (*Id.* Ex. 6.) A jury could infer from this evidence that Bongiovanni strung Luke along in an effort to get him to partially perform, while never intending to pay Luke anything at all. Emails between the parties regarding payment support this reading of the evidence. Luke sent Bongiovanni an invoice for the scheduled

January 1 payment of $8,000. (*Id.* Ex. 11.) Luke then flew to Arizona to record the video. But Bongiovanni never paid the January invoice. After Luke followed up on January 17, Bongiovanni blamed the lack of payment on Luke's failure to copy the relevant accounting department and said he would "check into" the January payment. (*Id.* Ex. 12.) He then told Luke he would see if he could "mail [the check] off" that day or wire the money the next day. (*Id.* Ex. 13.) Yet Luke was never paid, despite having produced the video for Bongiovanni. Especially in the context of a contract like this one, where the goods being exchanged are largely intellectual property and know-how, a jury could reasonably infer from this evidence that Bongiovanni never intended to pay Luke and used the Consulting Agreement to bait Luke into giving up certain property and creating the video for free.

To be sure, Bongiovanni has alternative explanations for all of this. He says that the terms of the deal changed because Luke misled him about the tax structure of TRPG, and that he only decided not to pay Luke after Luke wholly failed to live up to his end of the Consulting Agreement. But the point is that these facts are disputed. Plaintiffs' promissory fraud claim therefore survives summary judgment, and by extension, so do the rest of Plaintiffs' claims in the FAC, as the validity of the Consulting Agreement cannot be established as a matter of law.

//

//

//

//

//

//

//

//

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of personal jurisdiction and their converted motion for summary judgment are DENIED.

DATED: July 28, 2016

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE